IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SMAIL IMPORTS, INC., et al., | ) | |
| | ) | |
| | ) | 2:20-cv-109-NR |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RMJ, MOTORS, INC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

**J. Nicholas Ranjan, United States District Judge**

This case arises from a failed transaction for the sale of a car dealership and the land on which it is located.  The dealership at issue is a Hyundai dealership in Greensburg, Pennsylvania, owned by Defendant RMJ Motors; (Defendant NR Realty owns the land).  In July 2019, RMJ agreed to sell the Hyundai dealership to the lead plaintiff, Smail Imports.[1]  The sale of the dealership was contingent, however, on Defendant Hyundai Motor America approving the transaction.  Things went south when Hyundai sat on the approval paperwork for longer than expected, prompting RMJ to pull out of the deal, and terminate its agreement with Smail.  As a result, Smail filed this lawsuit, alleging that RMJ's termination of the agreement was invalid, and that Hyundai should be deemed to have consented to the sale by operation of the Pennsylvania Board of Vehicles Act.

Now, following discovery, all parties cross-move for summary judgment and agree that no material disputes of fact exist.  After careful consideration, the Court

---

[1] Simultaneously, and conditioned on the closing of the sale of the dealership, NR Realty agreed to sell the land on which the dealership is located to Plaintiff LMJ II.

will grant Defendants' motions, deny Smail's motion, and enter final judgment in favor of Defendants, for three main reasons.

First, Hyundai did not violate the Pennsylvania Board of Vehicles Act and cannot be deemed to have consented to the sale by operation of law. The Board of Vehicles Act places strict time limitations on how long a manufacturer like Hyundai can consider an application for the sale of a dealership before its silence will be deemed to be consent to the sale. Importantly, however, the manufacturer's deadlines are only triggered once the applicant has provided the manufacturer all the information initially required. Here, Smail failed to initially provide Hyundai with certain financial statements that Hyundai required from the outset. While Smail eventually provided the financial statements, the statutory clock did not begin to run until Smail provided that information to Hyundai—meaning the clock started running much later than Smail argues. As a result, RMJ terminated the agreement with Smail well before the Act's statutory deadlines expired and Hyundai could be deemed to have approved the deal.

Second, RMJ properly terminated its agreement with Smail. The main agreement here was an asset purchase agreement. It gave both sides the right to terminate the agreement if certain conditions had not been satisfied within 75 days of the agreement's execution. While Smail and RMJ dispute as to what exactly the requisite conditions were, RMJ properly terminated the agreement under either party's reading of the contract. Specifically, even under Smail's proposed interpretation of the termination conditions—which purportedly required Smail to finish submitting its application to Hyundai within 75 days of the agreement's execution—RMJ properly terminated the agreement when Smail did not finish

submitting its application to Hyundai within the 75-day period, due to the missing financial statements referenced above.

Third, RMJ did not breach any of its obligations before terminating the agreement.  In arguing otherwise, Smail faults RMJ for not doing more to obtain Hyundai's approval and for not notifying Smail of its concerns.  Smail argues that RMJ thus breached its contractual obligation to make all "commercially reasonable" efforts to close the deal as required by the agreement.  But fatal to Smail's arguments, once RMJ's termination rights arose, those rights superseded any such obligations on RMJ's part.  As well, the (in)actions Smail faults RMJ for failing to take were not "commercially reasonable" under the circumstances.  The approval process necessary to close the deal was between Smail and Hyundai.  That is, Smail was responsible for applying to Hyundai for approval and, further, Smail possessed all of the information that Hyundai required.  It would not be commercially reasonable, as a matter of law, to impose additional obligations on RMJ, not articulated in the contract, given that RMJ bore substantially higher information and transaction costs relative to Smail in obtaining Hyundai's approval.  Further, RMJ had no obligation, under either the parties' agreement or Pennsylvania common law, to provide advance notice to Smail before terminating the agreement.

For these reasons, discussed in full below, the Court will grant Defendants' motions and enter final judgment in their favor.

## BACKGROUND

Smail Auto Group and RMJ each operate car dealerships.  ECF 60-3, pp. 9:21-11:15; ECF 60-1, pp. 8:4-10:6.  RMJ's dealerships include a Hyundai franchise in Greensburg, Pennsylvania.  ECF 60-1, p. 10:3-12.  And NR Realty owns the land on which the Hyundai dealership is located.  ECF 55-2, PDF p. 2 (Recitals, ¶ C).  In 2019, RMJ agreed to sell its Hyundai dealership and assets to Smail.  ECF 55-2.  To

effectuate this transaction, Smail Auto Group formed the entity Smail Imports, Inc. (the lead named Plaintiff)[2] on June 19, 2019.  ECF 56-7, PDF p. 188.

      On July 24, 2019, Smail and RMJ entered into the Asset Purchase Agreement, detailing Smail's purchase of the Hyundai dealership from RMJ.  ECF 55-2. Simultaneously, Plaintiff LMJ and Defendant NR Realty reached an agreement for LMJ to purchase from NR Realty the land on which the dealership is located.  ECF 55-3.  This Real Property Agreement was made contingent on Smail and RMJ closing the sale of the Hyundai dealership.  ECF 55-2, PDF p. 2 (Recitals, ¶ D); ECF 55-3, PDF pp. 14-15 (Addendum A, ¶ 3).

      Because Hyundai had authorized only RMJ to operate the dealership, Smail and RMJ notified Hyundai of the Asset Purchase Agreement for Hyundai's approval around July 26, 2019.  ECF 55-4; ECF 55-53, PDF p. 33, ¶ 5.  On August 6, 2019, Hyundai emailed Smail an application package portal that Smail was to complete and electronically submit to Hyundai for Hyundai's review in deciding whether to consent to Smail's purchase of RMJ's dealership.  ECF 55-6; ECF 60-5, pp. 23:19-25:13; ECF 60-4, pp. 11:1-12, 65:13-23.  Only Smail, as the applicant, could access the application portal; RMJ did not have access.  ECF 60-4, pp. 65:24-66:11.  Hyundai's August 6 email also highlighted various "additional info on required items within the package," which Hyundai highlighted to clarify to Smail what Hyundai required in Smail's application.  ECF 55-6, PDF p. 2; ECF 60-5, pp. 23:19-25:13, 63:7-65:5. Included in the information Hyundai highlighted as "required items within the [application] package" was the following: "**<u>Financial Statements</u>**: Please provide personal statements for all owners. Please also provide current and 2 years prior

---

[2] Unless otherwise noted, "Smail" refers to Plaintiff Smail Imports, Inc.

Business Financial statements for any competitive franchises/dealerships or other business owned (if applicable)."  ECF 55-6, PDF p. 2.

   After receiving access to the application portal, Smail began working on its application, receiving assistance from RMJ when Smail requested it.  ECF 55-7; ECF 55-8.  Smail also reached out to Hyundai's regional agent at various times to seek clarification on certain aspects of the application, including what financial statements to provide in light of Smail having been formed only two months earlier.  ECF 60-6, pp. 109:7-110:11.  On August 28, 2019, Smail submitted its application to Hyundai, though it did not provide a copy of its application to RMJ.  ECF 55-52; ECF 55-9; ECF 60-6, p. 110:12-22.  While Smail's submission included hundreds of pages, it did not include financial statements for Smail Auto Group's other franchises/dealerships.  ECF 55-52.  Instead, Smail's application included a page stating, "Smail Imports, Inc. d/b/a Smail Hyundai is was [sic] formed June 19, 2019 for the purpose of acquiring and holding Mike Camlin Hyundai. There is no financial history for this entity. As such, there are no financial statements."  ECF 56-7, PDF p. 188.

   Once Smail submitted its application to Hyundai on August 28, Smail and RMJ tentatively planned for closing to occur on October 15, 2019.  ECF 55-10; ECF 60-6, p. 123:5-9.  Several days before October 15, however, with Smail having not yet heard back from Hyundai regarding Hyundai's approval of the application, Smail and RMJ agreed to push back the closing date to November 1 or November 4, 2019.  ECF 55-13; ECF 55-14; ECF 60-3, p. 67:8-21; ECF 60-6, p. 124:6-15.

   About two weeks before the revised closing date, on October 21, 2019, Hyundai informed Smail that its application was incomplete because it did not include the financial statements for Smail Auto Group's other franchises/dealerships, which Hyundai's original instructions required.  ECF 55-18; ECF 60-4, p. 76:16-22;

A

ECF 55-6.  Smail submitted this missing information a few days later, on October 23 and 24, 2019.  ECF 55-20; ECF 55-21; ECF 55-22; ECF 55-23; ECF 55-24.

By November 4, 2019 (the new closing date), Smail had still not heard from Hyundai on whether Hyundai approved Smail's application.  Thus, November 4, 2019 passed without Smail and RMJ closing the transaction, and RMJ notified Smail on November 5, 2019 that it was terminating the APA.  ECF 55-31.  In terminating the agreement, RMJ invoked Section 9.1(d) of the APA.[3]  *Id.*  According to RMJ's interpretation, Section 9.1(d) provided RMJ the right to terminate if Hyundai had not approved the transaction within 75 days of the APA's execution.  Given that 75 days had passed and the parties had still not received approval from Hyundai, RMJ sent its termination notice.[4]

In response, Smail contested RMJ's termination, asserting that the termination was improper and that Hyundai had already "statutorily" approved the transaction.  ECF 55-39.  That is, Smail contended that under the Pennsylvania Board of Vehicles Act, because Hyundai failed to respond to Smail's application within 60 days, Hyundai was deemed to have consented by operation of law.  Thus,

---

[3] Section 9.1(d) provides, "This Agreement may, by notice given prior to or at the closing, be terminated: . . . By either [party], so long as such Party seeking to terminate this Agreement has complied fully with its obligations under this Agreement, if the condition in <u>Section 5.5</u> (Manufacturer Application and Other Actions) has not been obtained on or before seventy-five (75) days from and after the date hereof[.]"  ECF 55-2, PDF pp. 31-32.

[4] Because LMJ's and NR Realty's Real Property Agreement was contingent on the closing of the APA, RMJ's termination of the APA also meant that LMJ and NR Realty did not close on the Real Property Agreement.

according to Smail, the Act's clock had run on Hyundai, so RMJ's notice of termination was late and ineffective.  *Id.*

Given this dispute, Smail and LMJ brought suit in state court against RMJ and NR Realty, and Defendants removed the case to federal court.[5]  ECF 1.  Smail and LMJ then filed an amended complaint, adding a claim against Hyundai, as well. ECF 2.   In the amended complaint, Smail brings two breach-of-contract claims against RMJ: breach of the APA (Count I) and breach of the Real Property Agreement (Count II).  *Id.* at ¶¶ 61-73.  Smail also brings a claim against Hyundai under the Pennsylvania Board of Vehicles Act (Count III).  *Id.* at ¶¶ 74-87.

Following fact discovery, the parties filed cross-motions for summary judgment.  Smail seeks summary judgment on all three counts.  ECF 53.  RMJ seeks summary judgment on Counts I and II (ECF 58), and Hyundai seeks summary judgment on Count III (ECF 61).  The parties filed supporting and opposing briefs on these motions, and the Court held oral argument.  ECF 70.  The matters are now ready for disposition.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  At summary judgment, the Court must ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).   In making this determination, "all reasonable inferences from the record must be drawn in favor of the nonmoving party and the court may not weigh the evidence or assess credibility." *Goldenstein v. Repossessors, Inc.*, 815 F.3d 142, 146 (3d Cir. 2016) (cleaned up).  The

---

[5] Unless otherwise noted, any reference to "Smail" includes both Plaintiffs Smail and LMJ; likewise, any reference to "RMJ" includes both Defendants RMJ and NR Realty.

moving party bears the initial burden to show the absence of a genuine dispute of material fact, and "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is improper. *Id.* (citation omitted).

But if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment "is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006) (citation omitted).

"The rule is no different where there are cross-motions for summary judgment." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). The parties' filing of cross-motions "does not constitute an agreement that if one is rejected the other is necessarily justified[.]" *Id.* But the Court may "resolve cross-motions for summary judgment concurrently." *Hawkins v. Switchback MX, LLC*, 339 F. Supp. 3d 543, 547 (W.D. Pa. 2018) (Conner, J.) (citations omitted). When doing so, the Court views the evidence "in the light most favorable to the non-moving party with respect to each motion." *Id.* (citations omitted).

## DISCUSSION & ANALYSIS

The Court turns first to Smail's and Hyundai's cross-motions for summary judgment regarding Count III, given that the analysis and resolution of that Count affects the Court's analysis with respect to the remaining counts. The Court will then

address Smail's and RMJ's cross-motions for summary judgment regarding Counts I and II.

## I.   The Court will grant Hyundai's motion for summary judgment, and deny Smail's motion for summary judgment, as to Smail's Pennsylvania Board of Vehicles Act claim (Count III).

Smail and Hyundai each move for summary judgment on Count III, in which Smail alleges that Hyundai violated Section 818.310(b)(5) of the Pennsylvania Board of Vehicles Act.  ECF 2, ¶¶ 74-87.  Because the undisputed facts show that Hyundai did not violate the Act, the Court will grant Hyundai's motion for summary judgment and deny Smail's motion.

Section 818.310(b)(5) of the Pennsylvania Board of Vehicles Act states that:

> It shall be a violation of this chapter for any manufacturer . . . to:  Fail to respond in writing to a request for consent as specified in paragraphs (3) and (4) within 60 days of receipt of a written request on the forms, if any, generally utilized by the manufacturer or distributor for such purposes and containing the information required. The failure to respond within the time period set forth in this paragraph shall be deemed to be approval of the request, and the manufacturer or distributor shall execute and deliver a franchise to the applicant within 30 days of the expiration of this time period. A manufacturer or distributor shall acknowledge in writing to the applicant the receipt of the forms, and, if the manufacturer or distributor requires additional information to complete its review, the manufacturer or distributor shall notify the applicant within 15 days of the receipt of the forms. If the manufacturer or distributor fails to request additional information from the applicant within 15 days after receipt of the initial forms, the 60-day time period for approval shall be deemed to run from the initial receipt date. Otherwise, the 60-day time period for approval shall run from receipt of the supplemental requested information. In no event shall the total time period for approval exceed 75 days from the date of the receipt of the initial forms.

63 P.S. § 818.310(b)(5).

Smail argues that Hyundai did not request "additional information" within 15 days of receiving Smail's application, nor responded in writing with its approval or disapproval of Smail's application within 60 days of receiving the application. *E.g.*,

ECF 54, pp. 27-29.   Thus, in Smail's view, Section 818.310(b)(5) dictates that Hyundai's "failure to respond within the time period set forth in this [provision] shall be deemed to be approval of [Smail's application]."   63 P.S. § 818.310(b)(5).   Smail argues that Hyundai therefore violated this provision because Hyundai did not "execute and deliver a franchise to [Smail] within 30 days of [Hyundai's statutorily-deemed approval]."   *Id.*

As discussed below, however, Smail's claim rests on the premise that Hyundai's deadlines under Section 818.310(b)(5) were triggered on August 28, 2019, when Smail initially submitted its application to Hyundai.   But this premise is incorrect, because Smail's initial submission did not include all of the information required by Hyundai from the outset.   Rather, the deadlines imposed on Hyundai— 15 days to request "additional information" and 60 days to "respond in writing"—were not triggered and did not begin to run until October 24, 2019, when Smail submitted all of the initially required information.   Thus, because Hyundai's deadlines under Section 818.310(b)(5) did not begin to run until October 24, 2019, and because RMJ terminated the APA on November 5, 2019—before any of Hyundai's statutory deadlines expired—Hyundai did not violate Section 818.310(b)(5).

The facts material to this issue are not in dispute.   On August 6, 2019, Hyundai provided Smail access to the application portal, along with a list of information that Hyundai required from Smail.   ECF 55-6.   Hyundai's list of "required items" included various documents and information about Smail's owners and related dealerships/franchises.   *Id.* at PDF p. 2.   For example, Hyundai required "all owners [to] . . . fill out an application," and required customer satisfaction history "for any other dealerships or franchises you are involved in, if applicable."   *Id.*   Also required, and most relevant here, were the "financial statements . . . for all owners," as well as the "Business Financial statements for any competitive franchises/dealerships or

other business owned (if applicable)," though Hyundai did not provide a specific form for these statements. *Id.*; ECF 55-40, p. 87:4-20.

Three weeks later, on August 28, 2019, Smail submitted its application to Hyundai. ECF 55-52. Missing from this submission, however, were the "Business Financial statements" of any of the other franchises/dealerships within Smail Auto Group's corporate umbrella. *See generally id.*; *see also* ECF 55-44, p. 105:2-16. Instead, Smail's application included only a single page on this topic stating, "Smail Imports, Inc. d/b/a Smail Hyundai is was [sic] formed June 19, 2019 for the purpose of acquiring and holding Mike Camlin Hyundai. There is no financial history for this entity. As such, there are no financial statements." ECF 56-7, PDF p. 188.

In providing only this single page of financial information, Smail relied on a phone call it had with Hyundai's regional agent. Specifically, Smail's agent asked Hyundai's agent what document to provide regarding Smail's financial statements, given that Smail lacked any financial history; Hyundai's agent instructed Smail to include the provided statement quoted above. ECF 60-6, p. 109:7-23. Notably, however, Smail's agent only asked about Smail's financial statements, and never asked about the financial statements for Smail Auto Group's other dealerships/franchises. *Id.* at pp. 109:24-110:11. Hyundai thus never instructed Smail to provide financial statements for Smail *only*, and not to provide the financial statements for the related dealerships/franchises—Smail simply did not ask about the financial statements for the related dealerships/franchises. Rather, as stated in its August 6, 2019, email, Hyundai required the related dealership financial statements. ECF 55-6.

After Hyundai's national office reviewed Smail's initial application, Hyundai notified Smail to provide the missing financial statements. ECF 55-18. Smail did so on October 23-24, 2019, about two months after it initially submitted its application. ECF 55-20; ECF 55-21; ECF 55-22; ECF 55-23; ECF 55-24. Smail therefore did not

submit all of the information initially required by Hyundai, and thus complete its application, until October 24, 2019.

As such, Hyundai's deadlines under Section 818.310(b)(5) were not triggered until October 24, 2019, when Smail submitted the missing financial statements that Hyundai required from the outset. This is because the statute's clock only begins to run once Hyundai received Smail's "*written request* on the forms, if any, generally utilized . . . for such purposes and *containing the information required*." *See* 63 P.S. § 818.310(b)(5) (emphasis added). That is, according to the most natural reading of this provision, Smail's "written request"—*i.e.*, its application—must at least "contain[ all of] the information required" to trigger the statute's deadlines. *See id.* (stating that it's a violation of the provision only once a manufacturer "Fail[s] to respond . . . within 60 days of receipt of a written request on the forms . . . and containing the information required"). The deadlines imposed on Hyundai by Section 818.310(b)(5) had therefore not expired when RMJ terminated the APA less than two weeks later.

Smail makes three main arguments to support its contention that the clock ran from the submission of its initial application, notwithstanding the missing financial statements. None of these arguments are ultimately persuasive.

***First***, Smail takes an overly narrow view of the term "forms" under the statute. That is, Smail argues that it completed the "forms" provided, and that the financial statements are separate documents or attachments. Therefore, Smail asserts that these separate financial statements were not part of the "forms" that it needed to submit to trigger the statute's clock. But this is too restrictive a reading of the statute.

To begin with, the application portal and accompanying email instructions provided by Hyundai to Smail expressly required the submission of certain materials, including all competitive business financial statements, as part of the application. This package of required material, as a whole, comprised the "forms," and the "information required" by those forms, under the statute. In other words, the

- 12 -

application portal comprised the "forms," while the accompanying email instructions requiring the financial statements comprised the "information required" by the forms.

But even if that weren't so, the statute is broader than simply having an applicant fill out standard forms initially to trigger the clock. That is, the statute permits the manufacturer to require information, from the outset, that an applicant may not be able to submit within the four corners of a form. *See* 63 P.S. § 818.310(b)(5) (stating it is a violation for a manufacturer to "Fail to respond in writing to a request for consent . . . within 60 days of receipt of a written request on *the forms, if any,* generally utilized by the manufacturer . . ." (emphasis added)).

Instructive in this regard is *Brooks Auto. Grp., Inc. v. GM LLC*, No. 18-798, 2020 WL 2309247 (W.D. Pa. May 8, 2020) (Horan, J.). In *Brooks*, the parties disputed whether the manufacturer violated Section 818.310(b)(5) by not timely responding to the franchise applicant's submission. As in this case, at issue was when the clock began to run under the statute. *Id.* at *3-4. In ruling in the manufacturer's favor, the court found: "An informed decision process cannot begin until the required initial information has been provided [to the manufacturer]. The statute allows for manufacturers to prescribe the initial required information, and once such information is submitted, the statutory time limit for the manufacturer to perform its investigation and to convey its decision, 60 or 75 days, begins to run." *Id.* at *4.

As relevant here, the court in *Brooks* found that Section 818.310(b)(5)'s deadlines did not turn on whether the information required could be submitted on a "form" or not—the manufacturer could require whatever information it needed, and the statutory clock would trigger only when all of the required materials were provided. *See, e.g.*, *id.* at *4 (describing the "required initial forms and information" and the "forms and documentation" the manufacturer required initially); *see also* 63 P.S. § 818.310(b)(5) (triggering the manufacturer's deadline after its "receipt of a

written request *on the forms*, if any, generally utilized by the manufacturer . . . *and containing the information required*" (emphasis added)).  In other words, the court in *Brooks* concluded that the deadlines under Section 818.310(b)(5) were not triggered until the manufacturer received *everything* it requested initially, regardless of whether the information could be submitted on a "form."  *See Brooks*, 2020 WL 2309247, at *4-5.  This Court agrees.

**Second**, Smail makes a similar, but slightly different, argument that Section 818.310(b)(5) only requires the initially submitted information to be captured on a form, and then gives the manufacturer the option to ask for additional, "non-form" information within 15 days.  Smail suggests that such "non-form" information would include separately provided materials such as the financial statements at issue here.  But this argument falls short.  Certainly, under the statute, a manufacturer can ask for additional information within 15 days of receiving the applicant's submission, should it need additional information not yet requested.  But that provision does not mean that the manufacturer is unable to require that information in the first instance, thereby requiring the applicant to submit such information before the statute's deadlines are triggered.

Indeed, Section 818.310, while providing certain protections to Smail, does not absolve Smail of its responsibility to fully complete Hyundai's initial requirements, nor shifts the onus to Hyundai to discover and remedy Smail's insufficient application—the Act is not so one-sided against Hyundai.  *See Rohrich Cadillac, Inc. v. Bureau of Prof'l & Occupational Affairs,* 73 A.3d 652, 657 (Pa. Commw. Ct. 2013) ("The legislature . . . has instructed that the Board of Vehicles Act is intended to promote fair dealing and honesty in the vehicle industry and among those engaged

therein without unfair or unreasonable discrimination or undue preference or advantage." (cleaned up)).

**_Third_**, Smail argues that Hyundai's August 6, 2019, email requiring the financial statements could only reasonably be read to encompass the financial statements of Smail itself, rather than of the entire Smail Auto Group's corporate family. *E.g.*, ECF 63, pp. 11-12. The Court disagrees. Hyundai's emailed instructions required the "personal [financial] statements for all owners," and then, in the same section, immediately instructed to "also provide . . . Business Financial statements for any competitive franchises/dealerships or other business owned (if applicable)." ECF 55-6, PDF p. 2. As the apparent focus of this requirement is on Smail's "owners" (*e.g.*, requiring the "*personal* statements for all owners"), the Court finds that this requirement is properly read as requiring financial information for all "competitive franchises/dealerships or other business owned" *by Smail's owners*, not just any such entities owned by Smail itself. Certainly, considering the nature of the transaction and Smail's non-existent financial history, such a requirement was neither unreasonable nor unexpected.

Returning, then, to the crux of the issue at hand, the Court finds that Section 818.310(b)(5)'s clock did not start to run until Smail had provided *all* of the information Hyundai required from the outset, including the financial statements for Smail's affiliated entities. That did not occur until October 24, 2019, which means that Hyundai's statutory deadlines had not expired when RMJ terminated its agreement with Smail less than two weeks later. Hyundai therefore cannot be deemed to have consented to the sale by operation of law.

To be sure, this may seem like a harsh result for Smail. Smail simply neglected to provide financial statements of its sister companies; and there is some evidence that Hyundai's regional manager "dropped the ball" by not discerning the missing information sooner. Smail was also quick to provide the information when Hyundai

eventually got around to asking for it. But Smail relies here on "statutory approval" to impute to Hyundai implicit consent to an agreement that it did not consent to explicitly. This is, in a certain sense then, a highly technical claim, demanding strict adherence to the terms of the statute. Smail cannot wield the strict requirements of the statute against Hyundai when it has not complied with those requirements itself.[6]

All told, because Smail did not submit the required financial statements until October 24, 2019, the statute's deadlines were not triggered until that point. As RMJ terminated the APA before Hyundai's deadlines expired, Smail's Count III fails as a matter of law. Summary judgment will be granted to Hyundai on Count III.

## II.   The Court will grant RMJ's motion for summary judgment, and deny Smail's motion for summary judgment, as to Smail's claim for breach of the Asset Purchase Agreement (Count I).

Turning next to Smail's claims against RMJ, Smail alleges in Count I that RMJ breached the Asset Purchase Agreement and improperly terminated the agreement. ECF 2, ¶¶ 61-67. Smail and RMJ each move for summary judgment on Count I. For the following reasons, the Court concludes that RMJ validly and effectively terminated the APA. The Court will therefore grant summary judgment to RMJ as to Count I, and deny Smail's motion for summary judgment.

### A.   RMJ's termination of the APA under Section 9.1(d) of the agreement was valid and effective.

Smail and RMJ first dispute whether RMJ could validly and effectively terminate the APA under Section 9.1(d) of the agreement, which was RMJ's basis for termination. ECF 55-31. While they dispute the proper interpretation of Section 9.1(d), the Court need not resolve the parties' competing interpretations, because even under Smail's proposed interpretation of Section 9.1(d), Smail cannot prevail.

---

[6] Moreover, this is not a situation where an applicant omitted immaterial or insignificant information. Rather, Smail did not include *any* financial statements for any of the other dealerships its owners owned. This would appear to be critical information, especially because the new Smail entity had no financial history itself.

Construing Section 9.1(d) of the APA in Smail's favor, RMJ properly terminated the agreement.

Section 9.1(d) of the APA gives either party the right to terminate the APA, "by notice given prior to or at the Closing . . . so long as such Party seeking to terminate this Agreement has complied fully with its obligations under this Agreement, *if the condition in Section 5.5 (Manufacturer Application and Other Actions) has not been obtained on or before seventy-five (75) days* from and after the date hereof[.]" ECF 55-2, PDF pp. 31-32 (emphasis added). Section 5.5, in turn, refers to Smail submitting its application to Hyundai. *Id.* at PDF pp. 20-21. Thus, Smail argues that on its face, Section 9.1(d) only permits termination of the APA if Smail failed to submit its application to Hyundai within 75 days of the APA's execution.

The APA is dated July 24, 2019, meaning Smail, per its own interpretation, had to finish submitting its application to Hyundai by October 8, 2019, to comply with Section 5.5 within 75 days. *See* ECF 55-2, PDF p. 1. But as discussed above, Smail did not complete its application submission to Hyundai until October 24, 2019, when it provided the missing financial documents that Hyundai had required from the outset. Smail thus did not satisfy "the condition in Section 5.5" within 75 days of the APA's execution. As such, RMJ could terminate the APA pursuant to Section 9.1(d) by giving notice "prior to or at the Closing." There is no dispute that it did so.[7] *See* ECF 55-31.

**B. RMJ did not breach the APA.**

Next, the parties dispute whether RMJ breached the APA by failing to take all commercially reasonable and necessary steps to close the transaction before

---

[7] Smail also cannot prevail under RMJ's proposed interpretation of the APA. RMJ argues that Section 9.1(d) allowed it to terminate the APA if Hyundai did not *approve* Smail's application within 75 days. As Hyundai did not provide such approval within the requisite 75 days, RMJ's termination was proper under this interpretation also. It is undisputed that Hyundai never affirmatively approved the application. And as

terminating the agreement.  *E.g.*, ECF 54, pp. 22-25; ECF 59, pp. 31-34.  Smail makes two primary arguments that RMJ breached its obligations: first, that RMJ improperly terminated the APA; and second, that RMJ did not reach out to Smail and Hyundai to try to complete the transaction before terminating the APA.  *E.g.*, ECF 54, pp. 22-24; ECF 64, pp. 12-14.  Neither argument prevails.

Smail's first argument—that RMJ improperly terminated the APA—is unavailing for the reasons just discussed.  Section 9.1(d) of the APA provided RMJ a valid basis to terminate the agreement.  So RMJ's termination of the APA itself cannot be a breach of its obligations.

Smail's second argument also falls short.  Smail does not dispute that RMJ satisfied its obligations before the original closing date, October 15, 2019.  *E.g.*, ECF 54, p. 18 ("Without a doubt, RMJ and Smail reasonably cooperated in the preparation and filing of [Smail's] Application."); *see also* ECF 55-7; ECF 55-8.  Rather, Smail asserts that RMJ "fail[ed] to take all appropriate actions with regard to the status of the Application *after October 15, 2019*, when the parties agreed to re-schedule the closing date[.]" ECF 54, pp. 23-24 (emphasis added); ECF 64, pp. 12-14.  Smail argues that RMJ thus breached the APA, which required the parties to "'take such further actions as may be necessary or appropriate to effectuate . . . the transactions,' [to] use 'commercially reasonable efforts to comply . . . with all [of their] respective covenants and agreements under this Agreement,' and [to] use 'commercially reasonable efforts to cause the conditions in Article 6 and Article 7, respectively, to be satisfied.'" ECF 54, p. 23 (quoting §§ 5.2, 5.3, & 5.16 of the APA).

This argument, however, is foreclosed by Third Circuit precedent.  In *National Data Payment Systems, Inc. v. Meridian Bank*, the Third Circuit concluded that a

---

discussed above, contrary to Smail's arguments, Hyundai cannot be deemed to have provided statutory consent under Section 818.310(b)(5) of the Board of Vehicles Act, as the statute's deadlines had not expired upon RMJ's termination of the APA.

party's vested, contractual right to terminate an agreement supersedes any good faith or best efforts obligations contained in the contract. *See Nat'l Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849, 855 (3d Cir. 2000) (Alito, J.) ("Although NDPS claimed that it would have a definite answer by the next day at the latest, it did not make its final decision to close until November 3, well after the termination date. By this time, Meridian's good faith obligation had been superseded by the Agreement's express termination option, and it was free to call off the deal at its discretion.").

In *National Data*, the relevant agreement stated that the "agreement may be terminated" if closing had not occurred by October 30. *Id.* at 852. On October 30, National Data told Meridian (the other party to the agreement) that it would decide whether to close the deal "later that day or the next day"; Meridian did not mention that that day was the final day before the termination provision was triggered. *Id.* at 853. But not until November 3 did National Data inform Meridian that it was "prepared to close immediately." *Id.* On November 6, Meridian terminated the agreement. *Id.* The Third Circuit found the termination valid and Meridian not in breach of its "best efforts" obligations under the agreement, reasoning that because Meridian's termination rights arose on October 30, Meridian was not subject to the best efforts obligations after that date—Meridian's "good faith obligation had been superseded by the Agreement's express termination option, and it was free to call off the deal at its discretion." *Id.* at 855.

The same goes here. RMJ's termination rights arose on October 8, 2019, when Smail missed the 75-day deadline to fully submit its application to Hyundai (per Smail's interpretation of Section 9.1(d)), as discussed above. Thus, as the Third Circuit reasoned in *National Data*, RMJ's termination rights superseded RMJ's "commercially reasonable" and best efforts obligations after that date. As Smail only

contends that RMJ violated these obligations after October 15, 2019 (*i.e.*, after RMJ's termination right vested), Smail's arguments fail as a matter of law.[8]

But even assuming RMJ had a duty to continue to use best efforts all along, Smail has not provided any legal or factual support for its contention that RMJ failed to do so. Under the APA, RMJ was required to use "commercially reasonable efforts."[9] Smail argues that this required RMJ to follow up with Hyundai to get Hyundai's approval for Smail, and to provide some advance notice to Smail to try to work out RMJ's concerns before terminating the agreement. Considering the nature of the transaction, however, these actions would not be "commercially reasonable."

While "commercial reasonableness" doesn't have a fixed definition, its focus is on what is reasonable in light of the transaction, the totality of the circumstances, and the economic interests of the parties. *See Paramount Fin. Commc'ns, Inc. v.*

---

[8] Smail attempts to distinguish *National Data* in two main respects. ECF 64, pp. 12-14. Smail first attempts to distinguish the termination provision in *National Data*, which provided that the "Agreement may be terminated by either [party] and shall be of no further force and effect" if closing did not occur by October 30. *Nat'l Data*, 212 F.3d at 852. Smail argues that the agreement automatically had "no further force and effect" if closing did not occur by October 30, and thus attempts to distinguish it from the APA here. ECF 64, pp. 12-13. But the Court does not find this language to matter, as the Third Circuit's decision was not based on this "no further force and effect" language. Second, Smail, in seeking to distinguish *National Data*, focuses on the scope of RMJ's obligations under the APA, arguing that the APA imposes certain obligations on RMJ until the "closing date," which is not a set date in the APA. ECF 64, pp. 13-14. But this too misses the mark. The Third Circuit's reasoning and conclusion in *National Data* focused on when the termination right arose, not when the best efforts obligations ended. That is, once the termination right arose, it superseded the best efforts obligations, regardless of how long the agreement would have otherwise imposed such obligations *in the absence* of the termination right vesting.

[9] Specifically, Section 5.5 required the parties to "reasonably cooperate" in the preparation and filing of Smail's application to Hyundai; to take all "appropriate action" regarding the same; and to use all "commercially reasonable efforts" for things that are necessary, appropriate, or advisable under law in order to consummate the transaction. ECF 55-2, PDF p. 21.

*Broadridge Inv. Commc'n Sols., Inc.*, No. 15-405, 2019 WL 3022346, at \*7 (E.D. Pa. May 23, 2019) ("Under this precedent, the Court concludes that 'commercially reasonable efforts' requires a totality of the circumstances assessment, in which economic interests and diligence, among other factors, may be considered."). Here, even when viewing the evidence in the light most favorable to Smail, there are three main considerations which convince the Court that imposing the obligations Smail seeks to impose on RMJ would be unreasonable as a matter of law.

First, the parties' economic interests and incentives suggest that it was not commercially reasonable to impose any obligations on RMJ to "follow up" with Hyundai. To obtain Hyundai's approval, Smail was required to provide certain information to Hyundai. This was information entirely within Smail's control, and concerned Smail alone. In fact, RMJ was not included on the correspondence between Smail and Hyundai, which is common as the selling party (*i.e.*, RMJ) is generally "not involved in the process, . . . [as] the process is primarily between Hyundai and the buying party [*i.e.*, Smail]." ECF 60-5, pp. 59:7-14, 75:1-9; ECF 60-4, p. 59:11-19. In this context, it was commercially reasonable for Smail, not RMJ, to be the one to follow up with Hyundai. Put differently, the information and transaction costs associated with RMJ serving as a point of contact with Hyundai on this issue were much higher here, and it would be both unusual and unreasonable to require RMJ to carry the burden of following up and ensuring that Hyundai acted in timely fashion. Instead, the party with much lower transaction costs (here, indisputably Smail) should carry that burden as a matter of commercial reasonableness. Smail points to nothing to the contrary.

Second, from RMJ's perspective, it was in a more precarious economic position. It was engaged in a potential sale with Smail, which very well could have fallen through (as it ultimately did). That risk would be of greater concern to RMJ as evidenced, for example, by the lengths it appears to have gone to keep the potential

sale relatively quiet for fear of losing employees.  *See* ECF 60-1, pp. 27:8-29:7, 32:10-18.  In Section 5.5 of the APA itself, the parties acknowledged some of these concerns, when they made clear that the efforts RMJ was required to engage in to close the deal did not extend to the point of causing disruption to its daily operations or incurring material expense or obligation.  Under these circumstances, it would have been commercially *un*reasonable to impose on RMJ affirmative obligations to ensure Hyundai's timely approval.[10]  Again, Smail points to nothing to the contrary in arguing otherwise.

Third, there is no basis in the APA to impose on RMJ a duty for it to provide Smail with additional and advance notice before seeking to terminate the APA.  If Smail desired those protections, it could have contracted for them *ex ante*.  Yet it did not.  Thus, to conclude that RMJ was required to take such actions—*i.e.*, to provide advance notice and time to attempt a resolution—before exercising its otherwise-vested termination rights would be to improperly add conditions to Section 9.1(d)'s termination provisions that are not included in, nor consistent with, the APA's text.  *See, e.g.*, *E.R. Linde Const. Corp. v. Goodwin*, 68 A.3d 346, 349 (Pa. Super. Ct. 2013) ("Generally, courts will not imply a contract that differs from the one to which the parties explicitly consented. We are not to assume that the language of the contract was chosen carelessly or in ignorance of its meaning. Where the language of the contract is clear and unambiguous, a court is required to give effect to that language." (citations omitted)); ECF 55-2, PDF pp. 31-32 (stating that a party may terminate the APA pursuant to Section 9.1(d) by simply giving "notice . . . prior to or at the Closing"); *cf. Nat'l Data*, 212 F.3d at 855 ("Meridian had no duty under the Agreement's best-efforts provision to remind NDPS of the approaching termination date. The October

---

[10] The facts here reflect that RMJ nonetheless made inquiries of Hyundai regarding Smail's application.  *E.g.*, ECF 60-4, pp. 28:2-29:11, 71:2-72:24.

30 termination provision was the subject of substantial negotiations during the Agreement's drafting, and it was explicitly spelled out on the face of the Agreement.").

For these reasons, including that RMJ's vested termination right superseded any subsequent obligations to take all commercially reasonable efforts under Third Circuit precedent, RMJ did not breach any requisite obligations before it terminated the APA.[11]

### C. RMJ did not waive the APA's time-is-of-the-essence provision and did not have a common-law obligation to provide reasonable notice to Smail before terminating the APA.

The Court turns last to Smail's and RMJ's dispute as to whether RMJ waived the APA's time-is-of-the-essence provision. If it did, RMJ would have a common-law obligation to provide Smail with reasonable notice prior to terminating the APA. The Court concludes that RMJ did not waive this provision, so RMJ's termination of the APA did not run afoul of any common law notice requirements.

Section 10.5 of the APA states, "With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence." ECF 55-2, PDF p. 34. Smail argues, however, that RMJ waived this time-is-of-the-essence provision through its conduct.[12]  *E.g.*, ECF 54, p. 21; ECF 64, pp. 15-17. That is, according to

---

[11] The Court also rejects Smail's arguments that RMJ breached the implied duty of good faith and fair dealing. ECF 54, pp. 24-25; ECF 2, ¶¶ 65, 71. Smail largely relies on the same grounds it raises regarding RMJ's purported breach of the APA. ECF 54, pp. 24-25. For the same reasons, the Court finds Smail's arguments unavailing, as RMJ properly terminated the APA under Section 9.1(d), and did not fail to take any required efforts.

[12] Smail doesn't phrase its argument quite like this, instead arguing that a party must provide reasonable notice if it acts like time is not of the essence. Yet the case law Smail cites centers on the waiver of a time-is-of-the-essence provision. Further, the APA itself does not set a closing date, so the only possible waiver relevant here is a waiver of the time-is-of-the-essence provision (*i.e.*, RMJ could not waive the closing date, because no such date was set in the APA). Smail cannot disconnect its argument that RMJ was subject to a common law requirement to provide reasonable notice prior to termination, from the purported waiver of the time-is-of-the-essence provision.

Smail, RMJ "acted as if time was not an essential aspect of the contract." ECF 54, p. 21. In particular, Smail points to RMJ agreeing to move the closing date from October 15, 2019 to November 4, 2019, as well as RMJ's cooperation with Smail during this time instead of immediately terminating the APA. *Id.*; *see also id.* at pp. 19-20 (relying on cases addressing waiver of deadlines and time-is-of-the-essence provisions). Smail argues that RMJ's cooperation operated as an implied waiver of the time-is-of-the-essence provision, and that, as a result, RMJ must comply with Pennsylvania common law, which requires parties to give reasonable notice before terminating a contract. *See, e.g.*, *Davis v. Northridge Develop. Associates*, 622 A.2d 381, 385 (Pa. Super. Ct. 1993) ("[E]ven though the time fixed in an agreement for settlement is stated to be of the essence of the agreement, it may be extended by oral agreement or be waived by the conduct of the parties, and where the parties treat the agreement as in force after the expiration of the time specified for settlement it becomes indefinite as to time and neither can terminate it without reasonable notice to the other." (citation omitted)).

The Court finds, however, that RMJ did not waive the time-is-of-the-essence provision.

The APA requires any waivers to be in writing. Section 10.7, which the parties focus much of their attention on, provides that "[n]either the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement . . . will operate as a waiver of such right, power, or privilege[.]" ECF 55-2, PDF p. 34. Additionally, and more significantly, Section 10.4 provides that "[a]ll notices, consents, *waivers*, and other communications under this Agreement *must be in writing*[.]" *Id.* at PDF p. 33 (emphasis added). Thus, even if the time-is-of-the-essence

provision does not comprise a "right, power, or privilege" addressed in Section 10.7, as Smail argues, Section 10.4 still requires such waiver to have been in writing.

It is undisputed that RMJ did not provide any written waiver of the time-is-of-the-essence provision, thus imposing a high burden for Smail to prevail. *See Nat'l Data*, 212 F.3d at 855 (rejecting National Data's argument that "Meridian's course of conduct constituted an implied waiver" because "the Agreement's no-oral-waiver clause clearly and unequivocally indicates the intention of the parties that there be no modifications or waivers of the contract provisions except in a writing signed by both parties. The parties even provided that delay in exercising rights under the contract would not constitute a waiver of those rights" (cleaned up)). Instead, Smail argues that RMJ implicitly waived the provision through its conduct.

It is true, as Smail argues, that a party may waive a time-is-of-the-essence provision through its conduct. But because Section 10.4 requires all waivers to be in writing, the evidence must first show that the parties clearly and unequivocally modified the requirement that waivers be in writing. That is, "[w]hile it is true that a written contract prohibiting a non-written modification may nevertheless be modified by a subsequent oral agreement, there must first be an intent to waive the contract requirement that amendments be in writing." *Douglas v. Benson*, 439 A.2d 779, 783 (Pa. Super. Ct. 1982); *see also Somerset Cmty. Hosp. v. Allan B. Mitchell & Associates*, 685 A.2d 141, 146 (Pa. Super. Ct. 1996) ("An agreement that prohibits non-written modification may be modified by subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing."). Thus, a party may modify a written-waiver requirement "without a writing if and when his conduct clearly shows an intent to waive the provision prohibiting non-written modification." *Douglas*, 439 A.2d at 783.

The burden for such a showing is a significant one. An implied modification of a written-waiver requirement "must be proved by clear, precise and convincing

evidence." *Somerset Cmty. Hosp.*, 685 A.2d at 146.  The party's conduct must "clearly show[] the intent to waive the requirement that the amendments be made in writing." *Id.*  In other words, the implied waiver "must be of such specificity and directness as to leave no doubt of the intention of the parties to change what they had previously solemnized by a formal document," and the evidence establishing the waiver "must be of such a persuasive character that it moves like an ink eradicator across the written paper, leaving it blank so that the parties in effect start afresh in their negotiations and mutual commitments." *MDNet, Inc. v. Pharmacia Corp.*, 147 F. App'x 239, 244 (3d Cir. 2005) (quoting *Gloeckner v. Sch. Dist. of Baldwin Tp.*, 175 A.2d 73, 75 (Pa. 1961)).

Here, the evidence does not so clearly show that RMJ agreed to amend the APA's requirement that all waivers be in writing, and thus RMJ could not have waived the time-is-of-the-essence provision by its conduct only.  While Smail argues that RMJ waived the time-is-of-the-essence provision through its conduct, Smail fails to show by "clear, precise and convincing evidence" that RMJ first waived the written-waiver requirement.  Indeed, the Court is unaware of, and the parties fail to show, any such evidence.

Nor is the Court persuaded that RMJ's conduct demonstrates that it waived the time-is-of-the-essence provision, or otherwise acted like time was not essential, regardless of the written-waiver requirement.  After determining that the original closing date (October 15, 2019) had to be postponed, RMJ agreed to a single, two-week postponement to the closing date.  *See* ECF 55-13; ECF 55-14.  The evidence shows, as Smail highlights, that RMJ made efforts to close the transaction even up to the day it terminated the APA.  *E.g.*, ECF 55-30; ECF 55-49, p. 8; ECF 55-45, pp. 106:17-107:1.  Yet RMJ promptly terminated the APA on November 5, 2019, the day after the parties' revised closing date—which had passed without the parties closing. Based on these undisputed facts, the Court concludes that RMJ did not waive the

time-is-of-the-essence provision or act like time was not essential. Rather, RMJ agreed to a single, short, finite extension of the closing date, and terminated the APA as soon as the revised closing date had passed without a closing.

The Court therefore finds unavailing Smail's argument that RMJ's termination was defective under Pennsylvania common law due to RMJ not providing reasonable notice before termination.

Accordingly, for all of the reasons discussed above, the Court will grant summary judgment to RMJ on Count I.

**III.    The Court will grant RMJ's motion for summary judgment, and deny Smail's motion for summary judgment, as to Smail's claim for breach of the Real Property Agreement (Count II).**

The Court will also grant summary judgment to RMJ on Count II. In Count II, Smail alleges that RMJ breached the Real Property Agreement that Smail and RMJ executed. ECF 2, ¶¶ 68-73. However, the Real Property Agreement was made contingent upon the simultaneous closing of the APA. ECF 55-2, PDF p. 2 (Recitals, ¶ D); ECF 55-3, PDF pp. 14-15 (Addendum A, ¶ 3). Because RMJ properly terminated the APA and the parties never closed, Smail's claim based on a purported breach of the Real Property Agreement fails. Summary judgment will therefore be granted to RMJ on Count II.

<u>**CONCLUSION**</u>

For the reasons discussed above, the Court will grant RMJ's motion for summary judgment (Counts I and II), grant Hyundai's motion for summary judgment (Count III), and deny Smail's motion for summary judgment. Final judgment will be entered in favor of Defendants. An appropriate order follows.

DATE: July 27, 2021                              BY THE COURT:

                                                 /s/ J. Nicholas Ranjan
                                                 United States District Judge

- 27 -